**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**JOHNNY RAY SIMS**                                                  **PETITIONER**

**v.**                                                  **NO. 1:13-cv-533-KS-MTP**

**JACQUELYN BANKS**                                                  **RESPONDENT**

### REPORT AND RECOMMENDATION

BEFORE THE COURT is the *pro se* Petition of Johnny Ray Sims for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Having considered the submissions of the parties, the record of the state court proceeding, and the applicable law, the undersigned recommends that the Petition [1] be DENIED.

### FACTS[1] AND PROCEDURAL HISTORY

On March 1, 2006, Mary Glen Knight (Knight) spent the day caring for her three great-grandchildren–five-year-old Jamaya Griffith, four-year-old Jané Griffith, and their baby sister, Jaylyn Knight. Knight lived on Doc Bass Lane in rural Jefferson Davis County, Mississippi. Sims and his sister, Margaret, lived down the street from Knight. Sims lived in a house he inherited from his parents, and Margaret lived in a trailer behind Sims's house.

Jané, who was ten-years old at the time of trial, testified that on the day of March 1, 2006, she and Jamaya spent the day playing in the front yard of Knight's house. Jané stated that Sims approached the girls and asked if their uncle, Lee Morris Knight, was at home. When Jané told Sims that their uncle was at the hospital, Sims asked Jané if she wanted to come over to his

---

[1] The factual summary is taken from the Mississippi Court of Appeals's opinion affirming Petitioner's conviction. *See Sims v. State*, 93 So. 3d 37 (Miss. App. 2011).

1

house and see his new big screen television.  Jané responded that she would have to first check

with her great-grandmother to obtain permission.

Knight testified that while Jamaya and Jané played outside in her front yard, she

remained inside of the house.  Knight explained that when she heard a man's voice outside, she

went to the porch to investigate.  Knight spotted Sims, and she stated that once Sims saw her, he

left the premises and walked down the road towards his house.  Knight asked Jané what Sims

had said to her, and Jané repeated that Sims had invited her over to see his big screen television.

Knight testified that during this conversation, Jamaya was standing beside her on the porch.

Knight then went back inside of the house to retrieve her laundry, and when she returned

to the porch, she testified that Jamaya was no longer in the yard.  Jané told Knight she had last

seen Jamaya riding her bike down the street and following Sims.  Concerned, Knight began

searching for Jamaya in the yard and inside of Knight's house.  When she failed to find Jamaya,

Knight then went to Sims's house, where she began knocking on the door and yelling for both

Jamaya and Sims.  Knight testified she never saw Jamaya's bicycle outside of Sims's house

during her search.  Knight's granddaughter, Regina Knight, and daughter, Marlene Asencio,

arrived approximately thirty to forty minutes after Knight had started searching for Jamaya.

Knight testified that Sims's sister, Margaret, eventually came home.  Knight asked

Margaret to go into Sims's house and see if he was inside of the house.  Margaret beat on the

door, but no one answered.  Margaret entered Sims's house through a side door, and then she

came out and told Knight that Sims had been asleep.  Sims opened the door and exited the house,

and he explained that he had been asleep when Knight banged on the door.

Marlene testified that upon arriving on Doc Bass Lane, she went to Sims's house and

2

found Sims outside, Marlene asked Sims to search his house, but in response, Sims walked next door to Margaret's trailer.  According to Marlene, Margaret eventually asked the women if they wanted to search Sims's house.  Marlene testified that she then observed Sims walk down from Margaret's trailer and enter the house through a side window.  Marlene heard Sims move furniture around before finally unlocking the door.  Marlene stated that after entering the house, she smelled bleach in the bathroom.  Upon entering the bathroom, she observed Sims's shirt soaking in bleach, and Marlene testified that "it looked to me like there was blood" on the shirt. Marlene asked Sims why his shirt looked like it had blood on it.  Sims denied that his shirt had any blood on it.  Marlene testified that she and Knight proceeded to search the house, but they did not check in the closets or in two of the bedrooms.  After failing to find Jamaya, Knight and Marlene called the Jefferson Davis County Sheriff's Department.

Deputy Sheriff Ronnie Barnes of the Jefferson Davis County Sheriff's Department responded to the call.  When he arrived at Doc Bass Lane, he spoke with the family and then began searching for Jamaya.  Barnes questioned Sims, and Sims claimed that he saw Jamaya riding down the road on her bike.  Barnes continued to search for Jamaya until Sheriff McCullum summoned him back to Sims's house.  Sheriff McCullum then asked Deputy Barnes to search Sims's house.

Deputy Barnes testified that upon entering Sims's house, he found Jamaya's bicycle, covered by a blanket.  He also noticed a strong smell of gasoline.  Deputy Barnes eventually found Jamaya's body, clothed only in a shirt and socks, and lying under a pile of clothes inside the closet of the southwest bedroom.  Deputy Barnes called the Mississippi Bureau of Investigation (MBI) for assistance; he then roped off the crime scene and waited for the MBI

3

investigators to arrive.

After his arrest, Sims denied harming Jamaya, and he informed the MBI investigators that earlier that day, he and a friend had driven to Bassfield, Mississippi. Sims explained to the investigators that his girlfriend, Angie Robinson, bleached his shirt that had been worn earlier in the day. Sims informed the investigators that a friend, whom Sims identified as Kenny, also visited his house that day. Sims was unable to provide any identifying details about Kenny; he did not know Kenny's last name, his address, where he had met Kenny; and he could not describe Kenny's vehicle. Sims stated that he went to sleep and woke up to knocking on his front door. Sims denied having visited Knight's house earlier that day.

A crime scene analyst with the MBI testified as to his investigation of the crime scene. The investigator found Jamaya's underwear in the closet next to her body. Jamaya's pants, one of her shoes, and a bloody knife were found in a piece of carpet rolled up in the laundry room. The investigator found Jamaya's other shoe under the bed in the southwest bedroom. The investigator testified he found blood stains on the mattress in that same bedroom, as well as blood spatters on the wall beside the bed containing the bloody mattress.

Jamaya's underwear, Jamaya's pants, Sims's underwear, the knife believed to have been used to kill Jamaya, and a swatch from the mattress in Sims's bedroom all tested positive for blood. DNA tests established that a hair removed from Jamaya's vaginal area belonged to Sims, and the blood on Sims's underwear and on the mattress contained a mixture of Sims's DNA and Jamaya's DNA. Sims's fingerprint and a palm print were also recovered from the middle of Jamaya's bicycle handlebar.

At trial, Dr. Steven Hayne, the forensic pathologist who performed the autopsy on

Jamaya's body, testified that he found a total of twelve stab wounds to Jamaya's body. Dr. Hayne also found superficial injuries to Jamaya's face and neck. Dr. Hayne testified that the bruising around Jamaya's neck and the small areas of bleeding over the facial area were consistent with incomplete strangulation. Dr. Hayne also noted a one-inch tear to the vulva and vaginal area, which produced blood. Dr. Hayne ultimately listed the cause of Jamaya's death as multiple stab wounds. Dr. Hayne testified that the knife found rolled up in the carpet in the utility room appeared consistent with the stab sounds on Jamaya's body.

On April 2, 2010, Petitioner was convicted of capital murder, with the underlying charge of kidnapping, in the Circuit Court of Jefferson Davis County, Mississippi. (State Court Record [12-10] at 147-48.) Petitioner was sentenced as a habitual offender to life imprisonment in the custody of the Mississippi Department of Corrections, pursuant to Miss. Code Ann. § 99-19-81. *Id.*

On May 6, 2010, Petitioner, through counsel, appealed his conviction to the Mississippi Supreme Court, raising the following ground for relief:

> The trial court should have granted Sims' Motion for a Directed Verdict because the evidence was insufficient to support the conviction of capital murder.

([12-21] at 176; [12-19] at 3-13.) On November 1, 2011, the Mississippi Court of Appeals affirmed Petitioner's conviction in a written opinion. *See Sims v. State*, 93 So. 3d 37 (Miss. App. 2011), *reh'g denied* May 1, 2012, *cert. denied*, July 26, 2012.

On November 29, 2012, Petitioner sought leave from the Mississippi Supreme Court to file his motion for post-conviction collateral relief in the trial court in which he asserted the following grounds (as stated by the *pro se* Petitioner):

1.      Whether the trial court erred in failing to disqualify the district attorney's

5

office.

2.    Whether the trial court erred in denying Sims's Motion(s) to Suppress (A) without probable cause; (B) illegal arrest; (C) illegal search and seizures; (D) fruits of the poison tree, etc.

3.    Whether the trial court errored [sic] in allowing broken chain of custody evidence to be used.

4.    Evidence was insufficient to support conviction for capital murder as the State failed to prove the elements of the underlying felony kidnapping charge beyond a reasonable doubt.

5.    Whether the evidence presented by the State was legally sufficient to support a verdict of guilty.

6.    Whether Petitioner was denied the effective assistance of counsel when his trial counsel failed to raise the issues of:

    (1)    whether the trial court erred in failing to disqualify the district attorney's office;

    (2)    whether the trial court erred in denying Sims's Motion(s) to Suppress; and

    (3)    whether the trial court errored [sic] in allowing broken chain of custody evidence to be used,

in his motion for judgment notwithstanding the verdict or in the alternative for new trial and . . .

Whether Petitioner was further denied the effective assistance of counsel on direct appeal when his appellate counsel failed and refused to raise the same Issues 1, 2, and 3 in the brief of the appellant, all in direct violation of his Sixth Amendment to the United States Constitution and Mississippi Constitution, Article 3, Section 26.

([12-22] at 7-21.)

The Mississippi Supreme Court denied Petitioner's application stating,

The panel finds that Sims's claims of ineffective assistance of counsel do not pass the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Those issues raised pertaining to the sufficiency of the evidence are barred by the doctrine

6

of *res judicata*.  The remaining claims put forth by Sims were either addressed on direct appeal or they were capable of being addressed and are waived.  Waiver notwithstanding, these issues are also without merit.  Accordingly, the panel finds that the application for leave should be denied.

(Order [11-2].)  On June 10, 2013, Petitioner filed the instant Petition for writ of habeas corpus, asserting the same grounds for relief he asserted in his collateral proceeding before the Mississippi Supreme Court.

## ANALYSIS

### Procedurally Barred Claims

Grounds One, Two, Three, and Five[2] in the habeas petition were not presented to the Mississippi Supreme Court on direct appeal but were submitted in Petitioner's collateral proceeding before the Mississippi Supreme Court.  In its order denying Petitioner's application to proceed in the trial court, the Mississippi Supreme Court found that the claims[3] were procedurally barred pursuant to Miss. Code Ann. § 99-39-21.[4]

---

[2] Petitioner's grounds for relief are enumerated *supra* pp. 5-6.

[3] Respondent does not argue that Ground Five was procedurally barred because the Mississippi Supreme Court, in its order denying Petitioner's application to proceed in the trial court, stated that "[t]hose issues raised pertaining to the sufficiency of the evidence are barred by the doctrine of *res judicata*.  The remaining claims put forth by Sims were either addressed on direct appeal or they were capable of being addressed and are waived." ([11-2].)  Ground 4 concerns the sufficiency of the evidence supporting the finding that the victim was kidnapped, and this was the only issue presented to the Mississippi Supreme Court on direct appeal.  Thus, this is the only issue that could have been barred by the doctrine of *res judicata*.  Ground 5 concerns the sufficiency of the evidence supporting a finding that Petitioner murdered the victim, and this issue was not presented on direct appeal.  It is apparent that the Mississippi Supreme Court found that this claim was procedurally barred as it was one of the claims that "were capable of being addressed and are waived." ([11-2].)

[4] Although the Mississippi Supreme Court did not directly cite to § 99-39-21, the language used by the state court tracks that of the statute. *Compare* Order [11-2] ("The remaining claims put forth by Sims were either addressed on direct appeal or they were capable of being addressed and are waived."), *with* Miss. Code Ann. § 99-39-21(1) ("Failure by a

Under the procedural-default doctrine, federal courts are precluded from reviewing a prisoner's habeas claim where the state court declined to address the claim for failure to meet a state procedural requirement.  "This Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  To satisfy the "independent" and "adequate" requirements, the state court's dismissal must clearly and expressly reflect that it rests on a state procedural bar, and the bar must be strictly or regularly applied by state courts to the vast majority of similar claims. *Martin v. Maxey*, 98 F.3d 844, 847 (5th Cir. 1996).

A state has failed to strictly and regularly apply a procedural rule only when the state "clearly and unequivocally excuse[s] the procedural default," and when the state fails to apply the rule to claims "identical or similar" to the petitioner's claim. *Amos v. Scott*, 61 F.3d 333, 339 (5th Cir. 1995).  Petitioner bears the burden of establishing that the State did not strictly or regularly follow a procedural bar. *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997). Petitioner has not purported to meet this burden.  Thus, his challenge remains procedurally barred unless an exception applies.

A federal court may consider a defaulted claim under two narrow exceptions: cause and actual prejudice or miscarriage of justice. *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2005).[5]

_____

prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal . . . shall constitute a waiver thereof and shall be procedurally barred . . . .").

[5] "The fundamental miscarriage of justice exception to the rule that state procedural default bars federal habeas review is limited to cases where the petitioner can make a persuasive showing that he is actually innocent of the charges against him." *Finley v. Johnson*, 243 F.3d

In his Petition, Petitioner argues that his trial and appellate counsel were constitutionally ineffective in failing to raise Grounds One, Two, and Three at trial or on direct appeal.[6]  "A defendant may show 'cause' by proving ineffective assistance of counsel in violation of the Sixth Amendment of the Constitution." *Pickney v. Cain*, 337 F.3d 542, 545 (5th Cir. 2003).  The United States Supreme Court has held that "the question of cause for a procedural default does not turn on whether counsel erred or on the kind of error counsel may have made.  So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland* . . . we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default." *Murray v. Carrier*, 477 U.S. 479, 488 (1986).

In Ground 6, Petitioner attempts to raise the defaulted claims through a claim of ineffective assistance of counsel claim.  The Mississippi Supreme Court considered and rejected Petitioner's ineffective assistance of counsel claims. (Order [11-2].)  As outlined in the undersigned's discussion of Ground 6, *infra* pp. 13-27, Petitioner failed to establish that the state court's decision–that Petitioner did not receive ineffective assistance of counsel–was an

---

215, 220 (5th Cir. 2001).

[6] Petitioner does not argue that his trial and appellate counsel were constitutionally ineffective in failing to raise Ground Five, and the record demonstrates that there was no "cause and actual prejudice or miscarriage of justice" regarding the issue of the sufficiency of the evidence supporting a finding that Petitioner murdered the victim.  Thus, Ground Five remains procedurally barred.  Notwithstanding the procedural bar, there is ample evidence in the record demonstrating that a rational trier of fact could have found beyond a reasonable doubt that Petitioner murdered Jamaya. *See Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001).  For example, Jamaya's bicycle was found in Petitioner's home ([12-13] at 115); Jamaya's body, which had been stabbed twelve times, was found in Petitioner's home ([12-13] at 117-18); Petitioner's hair was found on Jamaya's vaginal area ([12-16] at 49-57); and Jamaya's DNA was found on Petitioner's underwear ([12-16] at 71).

unreasonable application of *Strickland*. Accordingly, as Petitioner has not overcome the procedural bar as to Grounds One, Two, Three, and Five, relief on those grounds should be denied.

### Claims Considered on the Merits

The standard of review for the claims which may be reviewed by this Court–Grounds Four and Six–is set forth in 28 U.S.C. § 2254(d), which provides that a federal court may not grant habeas relief unless the state court's adjudication of the claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002).

The "contrary to" clause applies when the state court fails to apply a legal rule announced by the Supreme Court or reaches a result opposite to a previous decision of the Court on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The "unreasonable application" clause applies when the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id*. at 407-08. The "unreasonable application" inquiry is based on an objective standard, and "unreasonable" does not equate with "incorrect." *Garcia v. Dretke*, 388 F.3d 496, 500 (5th Cir. 2004).

Habeas corpus serves as "a guard against extreme malfunctions in the state criminal

justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S.86, 102-03 (2011) (internal quotations omitted).  A federal court does not "sit as a 'super' state supreme court" and may decide the issues presented by the habeas petition "only to the extent that federal constitutional issues are implicated." *Smith v. McCotter*, 786 F.2d 697, 700 (5th Cir. 1986).

### *Ground 4*

In Ground Four of his Petition, Petitioner argues that the evidence was insufficient to support a finding that he kidnapped the victim and, therefore, was insufficient to support a conviction of capital murder.  The crime of kidnapping is codified by Miss. Code Ann. § 97-3-53, which provides:

> Any person who, without lawful authority and with or without intent to secretly confine, shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will, or without lawful authority shall forcibly seize, inveigle or kidnap . . . any child under the age of sixteen (16) years against the will of the parents or guardian or person having the lawful custody of the child, upon conviction, shall be imprisoned . . . .

Insufficiency of the evidence can support a claim for habeas relief only if the evidence, when viewed in the light most favorable to the State, is such that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001).  The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. Stevenson*, 126 F.3d 662, 664 (5th Cir. 1997).  The determination of the sufficiency of the evidence by a state appellate court is entitled to great deference. *See Callins v.*

*Collins*, 998 F.2d 269, 276 (5th Cir. 1993) (citing *Parker v. Procunier*, 763 F.2d 665, 666 (5th Cir. 1985) ("Where state appellate court has conducted a thoughtful review of the evidence . . . its determination is entitled to great deference."))

Petitioner agues that there was insufficient evidence to support a finding that he kidnapped the victim because the State did not present an eyewitness or other direct evidence demonstrating that he seized the victim or lured the victim into his home.  The Mississippi Court of Appeals addressed and rejected Petitioner's argument noting that "'[c]ircumstantial evidence is sufficient to prove the elements of kidnapping[,]' [and] 'direct evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt.'" *Sims*, 93 So. 3d at 42 (quoting *Underwood v. State*, 708 So. 2d 18. 35 (Miss. 1998)).  The court of appeals stated:

> The State cites *Neal v. State*, 451 S. 2d 743, 757-58 (Miss 1984), wherein the supreme court held that circumstantial evidence such as the victim's dress, location of the body, and bruised condition of the body were sufficient to show that the victim did not voluntarily accompany Neal.  In the present case, the bruises to Jamaya's face and neck, the evidence of strangulation, the removal of part of her clothing and also the tears in her vaginal area all would indicate that force was used at some point in time to make her do something against he will.

*Id*. (internal quotations and citation omitted).

The court of appeals concluded that "the State presented sufficient circumstantial evidence to prove the elements of kidnapping such that reasonable and fair-minded jurors could have found that Sims inveigled Jamaya with the intent to cause her to be secretly confined or imprisoned against her will." *Id*.  The record demonstrates that Jamaya's body was found in Petitioner's home, clothed only with a shirt and socks. ([12-13] at 117.)  Her panties had been removed and there was trauma to her vaginal and rectal area. ([12-14] at 90.)  There was bruising

and other superficial injuries to her face and neck, which were consistent with incomplete strangulation. ([12-15] at 8, 12-13.)  Additionally, Jamaya's bicycle was found in Petitioner's home. ([12-13] at 115.)

The evidence in this case, when viewed in the light most favorable to the State, is not such that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Santellan*, 271 F.3d at 193.  The undersigned finds that Petitioner has not established that the Mississippi Court of Appeals's decision on this issue is contrary to, or involves and unreasonable application of, clearly established federal law, or that the decision was based on an unreasonable determination of the facts in light of the evidence.  Habeas relief on this claim should be denied.

### *Ground 6*

In Ground 6, Petitioner argues that his trial and appellate counsel provided him ineffective assistance.  As outlined above, the Mississippi Supreme Court held that Grounds One, Two, Three, and Five were procedurally barred under Mississippi law.  Petitioner now attempts to bring Grounds One, Two, and Three before this Court in the context of an ineffective assistance of counsel claim.  As outlined above, ineffective counsel may provide cause to avoid a procedural bar, but the "cause and prejudice" test is only satisfied if counsel's performance is rendered ineffective under the *Strickland* standard.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court defined the standard by which an ineffective assistance of counsel claim in a habeas proceeding is to be measured.  Pursuant to *Strickland*, Petitioner must show that his "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." 466 U.S. at 687; *see*

*also Motley v. Collins,* 18 F.3d 1223, 1226 (5th Cir. 1994) (stating that satisfaction of the standard requires a showing that counsel's acts "fell below an objective standard of reasonableness"). In order to establish a deficiency, Petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* This Court's "scrutiny of counsel's performance must be highly deferential" and it must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689; *see also Moawad v. Anderson,* 143 F.3d 942, 946 (5th Cir. 1998) (observing that the court "gives great deference to counsel's assistance, strongly presuming that counsel has exercised reasonable professional judgment") (internal quotations and citations omitted).

"To meet the prejudice prong of the *Strickland* test, the defendant may not simply allege but must 'affirmatively prove' prejudice." *Bonvillain v. Blackburn*, 780 F.2d 1248, 1253 (5th Cir. 1986) (citing *Celestine v. Blackburn*, 750 F.2d 353, 356 (5th Cir. 1984)). Further, Petitioner must not only prove that the outcome of his trial would have been different "but for counsel's alleged errors," but must also prove that "'the result of the proceedings was fundamentally unfair or unreliable.'" *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)). An ineffective assistance of counsel claim must be stated with specificity. *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990). Summarily reciting general complaints about counsel's performance without discussing their specific basis or how application of the law purportedly justifies relief does not state a claim for habeas review. *Hughes v. Dretke*, 412 F.3d 582, 597 (5th Cir. 2005); *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) ("[C]onclusory allegations of ineffective assistance of counsel do not raise a

14

constitutional issue in a federal habeas proceeding.")

In considering Petitioner's application for post-conviction relief, the Mississippi Supreme Court reviewed the claims of ineffective assistance of counsel and determined that Petitioner failed to meet his burden. (Order [11-2].)  Given that the ineffective assistance of counsel claims before this Court present a mixed question of law and fact[7] and that *Strickland* is the "clearly established Federal law" which governs such claims, the issue in this case is "whether the Mississippi Supreme Court's decision to reject [Petitioner's] ineffective assistance claim[s] 'involved an unreasonable application' (and not merely an incorrect application) of *Strickland.*" *Neal v. Puckett,* 286 F.3d 230, 236 (5th Cir. 2002).

### Disqualification of District Attorney's Office

In his first allegation of ineffective assistance, Petitioner contends that his trial and appellant counsel rendered ineffective assistance by not properly raising the issue of whether the trial court erred in failing to disqualify the district attorney's office.  Prior to the trial, Petitioner's trial counsel filed a motion to recuse the office of the district attorney.  In the motion, trial counsel asserted that Assistant District Attorney Morris Sweatt represented the State in its prosecution of Petitioner.  Trial counsel also asserted that Sweatt formerly served as a public defender and was previously appointed to represent Petitioner after he was indicted for aggravated assault in 2001. ([12-4] at 141-47.)  The trial court conducted a hearing and denied Petitioner's motion. ([12-5] at 115-17.)  Petitioner argues that trial and appellant counsel should have raised this issue in a motion for judgment notwithstanding the verdict and on direct appeal.

The Mississippi Supreme Court has held that "[i]t is firmly established that a prosecuting

---

[7] *Nixon v. Epps,* 405 F.3d 318, 324 (5th Cir. 2005).

15

attorney is disqualified from acting in a criminal case if he has previously represented or been consulted professionally by the accused *with respect to the offense charged*." *Gray v. State*, 469 So. 2d 1252, 1254 (Miss. 1985) (emphasis added).  The supreme court further held that "the subsequent prosecution of a criminal defendant by an attorney who has gained confidential information from the accused relative to the charges against him is inherently incompatible with the right of a criminal defendant to receive a fair trial." *Id*.  However, the case *sub judice* does not involve an attorney who previously represented Petitioner with respect to the offense charged–capital murder.  The record demonstrates that Sweatt briefly represented Petitioner with respect to an aggravated assault charge in 2001. ([12-5] at 91-93.)

There is no indication that Sweatt gained any confidential information relative to the charge against Petitioner for a murder which occurred in 2006.  Petitioner has not alleged that he gave Sweatt any relevant information that would have impacted the 2006 murder charge. Additionally, Sweatt testified at the hearing that he had no recollection of representing Petitioner. ([12-5] at 99-100.)  The Mississippi Supreme Court pointed out that "no purpose would be served by applying the proscriptive rule to bar a prosecuting attorney's participation in a criminal case where the evidence fails to establish that the attorney, by reason of his professional relations with the accused, gained any confidential information regarding the matter involved in the criminal prosecution." *Gray*, 469 So. 2d at 1255.

The record establishes that there were no grounds to disqualify the district attorney's office.  Thus, even if trial and appellant counsel had properly asserted this issue in a motion notwithstanding the verdict and on direct appeal, there is no indication that Petitioner would have prevailed on the motion or on appeal.  Petitioner has failed to establish that the Mississippi

16

Supreme Court unreasonably applied the *Strickland* requirements.

<u>*Suppression of Evidence*</u>

In his second allegation of ineffective assistance, Petitioner contends that his trial and appellant counsel rendered ineffective assistance by not properly raising the issue of whether the trial court erred in failing to suppress evidence seized as part of an illegal search and arrest. Prior to the trial, Petitioner's trial counsel filed a motion to suppress the evidence found during law enforcement's search of Petitioner's home. In the motion, trial counsel asserted that law enforcement officers searched Petitioner's home without a warrant, exigent circumstances, or valid consent. Trial counsel argued that the search constituted a violation of the Fourth Amendment and precluded the State from using any evidence found as a result of the search. ([12-3] at 138-42.) The trial court conducted a hearing and denied Petitioner's motion, finding that Petitioner had given officers implied consent to search. ([12-6] at 72-142.)

Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman*, 477 U.S. at 375. Accordingly, in order to show ineffective assistance in these circumstances, Petitioner must first show that his Fourth Amendment claim has merit. *See United States v. Oakley*, 827 F.2d 1023, 1025 (5th Cir. 1987) ("The inquiry turns on whether a hypothetical motion to suppress would have been successful.")

A search conducted pursuant to consent is one of the well-settled exceptions to the Fourth Amendment's warrant requirement. *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir.

1997).  Consent can be express or implied. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Jaras*, 86 F.3d 383, 390-91 (5th Cir. 1996).  Consent to a warrantless search may be implied by the circumstances surrounding the search or by a person's failure to object to the search. *See United States v. Varona-Algos*, 819 F.2d 81, 83 (5th Cir. 1987), *overruled on other grounds by*, *Jaras*, 86 F.3d 383; *see also Johnson v. Smith County*, 834 F.2d 479, 480 (5th Cir. 1987).  "The standard for measuring the scope of the suspect's consent is objective reasonableness.  Recitation of magic words is unnecessary; the key inquiry focuses on what the typical reasonable person would have understood by the exchange between the officer and the suspect." *U.S. v. Stewart*, 93 F.3d 189, 192 (5th Cir. 1996).

During the hearing before the trial court, Sheriff Henry McCullum testified that after he arrived at Doc Bass Lane, Jamaya's great-grandmother informed him that Jamaya might have been with Petitioner. ([12-6] at 78.)  The Sheriff went to Petitioner's home, saw Petitioner on the porch of his sister's house, and called him over to his own house. ([12-6] at 79-80.)  After questioning Petitioner concerning the whereabouts of Jamaya, the Sheriff told Petitioner "we need to look in your house." ([12-6] at 80.)  Petitioner tried to open the door and stated that it was locked, and the Sheriff asked if he had a key. ([12-6] at 81.)  Petitioner stated that his sister, Margaret, had a key. ([12-6] at 81.)

The Sheriff went to the sister's home but was unable to find a key.  At that time, Margaret's boyfriend, Jessie, stated that he could get in through the window. ([12-6] at 82.)  They returned to Petitioner's home, and Jessie entered the house through the widow and opened the door. ([12-6] at 82.)  According to the Sheriff, Petitioner never indicated that the Sheriff did not have permission to go in the house. ([12-6] at 82.)  During the hearing, an investigator with

the Mississippi Bureau of Investigation, Roy Clingon, also testified. According to Clingon, he interviewed Petitioner in jail after his arrest and Petitioner "basically gave us a statement that he told the officers on the scene that they could go in and search the house, gave them consent to search." ([12-6] at 114.)

> After hearing this testimony, the trial court stated:

> Johnny Ray obviously did try to get in according to the sheriff's testimony. He did know that they were going to the sister's. He was fully aware of all the things. If he did not implicitly give his permission, he sure came close to it. And he . . . never, according to the sheriff, made any representation to stop, and his actions would speak much louder than his words. He knew what they were doing, and he even attempted to help.

([12-6] at 127-28.)

The record establishes that there were facts supporting a finding that it was objectively reasonable for the Sheriff to believe that he had Petitioner's consent to search his home. Petitioner attempted to open the door to his home following the Sheriff's request to search the home. After discovering that the door was locked, Petitioner informed the Sheriff that his sister had a key. Thereafter, Petitioner failed to object as his sister's boyfriend volunteered to enter Petitioner's home through the window and unlock the door.

Petitioner has failed to demonstrate that he would have been successful had his counsel properly asserted this issue in a motion notwithstanding the verdict and on direct appeal. Petitioner has failed to establish that the Mississippi Supreme Court unreasonably applied the *Strickland* requirements.

Petitioner also contends that his trial and appellant counsel rendered ineffective assistance by not properly raising the issue of whether the trial court erred in failing to suppress evidence seized after an illegal arrest. Petitioner asserts that he was arrested without probable

19

cause prior to the search of his home.  Petitioner argues that the arrest constituted a violation of

the Fourth Amendment and precluded the State from using any evidence found as a result of the

search which took place after his illegal arrest.

"Police detention constitutes an 'arrest,' such that it must be accompanied by probable

cause, if a reasonable person in the suspect's position would understand the situation to be a

restraint on freedom of the kind that the law typically associates with a formal arrest." *Freeman

v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007).  While courts consider the totality of the

circumstances, "the ultimate inquiry is simply whether there was a formal arrest or restraint on

freedom of movement of the degree associated with formal arrest." *Stansbury v. California*, 511

U.S. 318, 320-22 (1994) (internal quotations and citations omitted).

During the hearing before the trial court, the Sheriff testified that he placed Petitioner in a

patrol car after his sister's boyfriend opened the door, but prior to the search of his home.  The

Sheriff stated,

> Well, you know, it was . . . getting very tense, and you had a high emotion from quite
> a few people.  And a lot of the family was gathering up.  And Ms. Knight had figured
> that he had did something with the child, and that's kind of what she was putting out
> there to the folks that was coming up.  And, you know, so I felt that I needed to place
> him someplace, you know, to secure him so that he wouldn't be harmed or whatever.

([12-6] at 83.)  According to the Sheriff, Petitioner was not under arrest at the time he was placed

in the patrol car but was placed under arrest after officers found Jamaya's bicycle in his home.

([12-6] at 91-94.)

After hearing the Sheriff's testimony, the trial court stated, "I do believe that this was an

extraordinarily heated environment as the sheriff said, and he put him in his car for his own

safety more than anything else.  It was not to get him to remain silent or to remove him from his

free rights; it was for his own safety according to the sheriff's testimony." ([12-6] at 128.)

Under the totality of the circumstances, there were facts supporting the trial court's finding that Petitioner was not in custody because a reasonable person in his place would not have felt that he was under a formal arrest, but would have understood that he was in danger and had been placed in the patrol car only for his own safety. *See United States v. Black*, 2013 WL 3814273, at *12 (N.D. Ga. July 22, 2013) (finding that there was no restraint on a defendant's freedom of movement of the degree associated with formal arrest even if defendant was not free to leave the patrol car after she was place there for her own safety and comfort); *see also State v. McCaulley*, 831 N.E.2d 474, at 476 (Ohio App. 2005) (holding that placing a driver in a patrol car during a routine traffic stop may be justified if it protects the officers or the driver from a dangerous situation, such as the escalation of a volatile situation).[8]

Petitioner has failed to demonstrate that he would have been successful had his counsel properly asserted this issue in a motion notwithstanding the verdict and on direct appeal. Additionally, Petitioner has failed to establish that the Mississippi Supreme Court unreasonably applied the *Strickland* requirements.

---

[8] Additionally, a brief investigatory stop does not constitute an arrest if a reasonable person would believe that he could leave once the reason for the detention has been satisfied. *See United States v. Bengivenga*, 845 F.2d 593, 600 (5th Cir. 1988); *see also Bartlett v. State*, 249 S.W.3d 658, 669 (Tex. App. 2008) (holding that police officer's acts of handcuffing defendant, placing him in patrol car, and transporting him away from crowds at motorcycle rally did not transform investigative detention into a formal arrest, where police officer sought to get defendant away from the scene in order to head off potential volatile situation between members of rival groups); *United States v. Garcia*, 997 F.2d 1273, 1281-82 (9th Cir. 1993) (holding that officers may restrain an individual by placing him against a wall during a consent search of a house while the officers completed a protective sweep).

*Chain of Custody*

In his third allegation of ineffective assistance, Petitioner contends that his trial and appellant counsel rendered ineffective assistance by not properly raising the issue of whether the trial court erred in allowing the admission of evidence despite the State's failure to show a continuous chain of custody.  Petitioner argues that three items of evidence should not have been admitted due to chain of custody issues.  Those items include: (1) the latent prints lifted from Jamaya's bicycle, (2) Petitioner's underwear, and (3) Jamaya's underwear.

The Mississippi Supreme Court has held that "[t]he test of whether there has been a break in the chain of custody of evidence is whether there is an indication or reasonable inference of probable tampering with the evidence or substitution of the evidence." *Ellis v. State*, 934 So. 2d 1000, 1005 (Miss. 2006).  A mere suggestion of tampering is not enough to establish a reasonable inference of probable tampering. *Hughes v. State*, 90 So. 3d 613, 632 (Miss. 2012). "[T]he burden to produce evidence of a broken chain of custody (i.e., tampering) is on the defendant." *Hemphill v. State*, 566 So. 2d 207, 208 (Miss. 1990).  The determination of whether a proper chain of custody has been established is within the discretion of the trial court. *Nalls v. State*, 651 So. 2d 1074, 1077 (Miss. 1995).  The State does not have to produce every person who handled the evidence, nor does the State have to account for every minute of every day. *Butler v. State*, 592 So. 2d 983, 985 (Miss. 1991).  "[B]reaks in the chain of custody go to the weight of the evidence, not its admissibility." *Jenkins v. State*, 997 So. 2d 207, 213 (Miss. App. 2008).

"It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding

whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  An error in an evidentiary ruling only merits relief where it is "so extreme that it constituted denial of fundamental fairness . . . ." *Castillo v. Johnson*, 141 F.3d 218, 224 (5th Cir. 1998).  Thus, Petitioner must show that there was an evidentiary error rendering his trial fundamentally unfair, and that his counsel's failure to raise the issue constituted ineffective assistance of counsel.

Petitioner asserts that the trial court erred in allowing the State to present evidence regarding the prints taken from Jamaya's bicycle because the original latent print card was lost prior to trial.  Petitioner argues that counsel was ineffective for failing to challenge this error.  At trial, a latent print analyst with the Mississippi Crime Laboratory, Paul Wilkerson, testified that he received Jamaya's bicycle at the crime laboratory, lifted two prints from the bicycle, and compared them to Petitioner's known prints. ([12-15] at 105-09.)  According to Wilkerson, Petitioner's palm print and finger print were on Jamaya's bicycle. ([12-15] at 109-10.)  Wilkerson took a photograph of the latent prints he lifted. ([12-15] at 113.)  Wilkerson testified that "[w]e keep photographs of all the latent prints that we develop in the laboratory, whether they're identified at that time or not.  The primary purpose is to have a recording of that latent print of sufficient quality that we can use it for further comparison, if necessary." ([12-15] at 115.)  According to Wilkerson, the photograph which was presented to him during his testimony was a copy of the photograph he maintained in his file. *Id.*

Deputy Ronnie Barnes testified that he retrieved Jamaya's bicycle from the crime laboratory and transported it to the Jefferson Davis County Sheriff's Department in the back of a department pickup truck. ([12-15] at 51-52.)  According to Barnes, he did not know that a print

card was attached to the bicycle and did not see a print card after he arrived at the Sheriff's Department.  Barnes testified that he did not learn that a print card was attached to the bicycle until after he transported the bicycle.  ([12-15] at 52.)

Trial counsel attempted to undermine the weight of Wilkerson's testimony.  For example, counsel asked Wilkerson, "[s]o this photocopy wouldn't do me [a] bit of good in questioning you about it.  It's not good enough is it?" ([12-15] at 113.)  Counsel also stated, "[b]ut if I'm correct, you just said when you testified in court you like to have the original and compare it with your copies to make sure nothing has happened?" ([12-15] at 114.)

Petitioner has failed to present evidence supporting a theory of wrongful tampering with the evidence, or the probability thereof.  Wilkerson's testimony established that he examined the prints taken from Jamaya's bicycle and established that the photograph he reviewed in court was the photograph of those prints which was maintained in his file.  Courts have held that where original prints have been lost, an accurate photograph thereof may be received in evidence in lieu of the original. *See*, *e.g.*, *Com v. Rice*, 805 N.E.2d 26, 39 (Mass. 2004); *State v. Foster*, 200 S.E.2d 782 (N.C. 1973); *State v. Reasoner*, 742 P.2d 1363, 1371-72 (Ariz. App. 1987); *State v. Everette*, 1979 WL 208427, at **2-3 (Ohio App. Oct. 24, 1979); and *Sharp v. State*, 214 N.W. 643 Neb. 1927).  Petitioner has failed to demonstrate that he would have been successful had his counsel properly asserted this issue in a motion notwithstanding the verdict and on direct appeal. Petitioner has failed to establish that the Mississippi Supreme Court unreasonably applied the *Strickland* requirements.

Petitioner also asserts that the trial court erred in allowing Petitioner's underwear and Jamaya's underwear to be admitted into evidence because the evidence bags which contained

24

these articles of clothing had been opened prior to trial.[9]  Petitioner argues that counsel failed to properly challenge the admission of these articles of clothing into evidence.  At trial, a former agent with the MBI, Marcos Rogers, testified that he collected Jamaya's underwear, which were lying next to Jamaya's body in Petitioner home, placed them in an evidence bag, and sealed the bag. ([12-14] at 86-87.)

Another former agent with the MBI, Roy Clingon, testified that he collected Petitioner's underwear after Petitioner was taken into custody, placed them in a sealed evidence bag, and gave them to Agent Rogers. ([12-14] at 127.)  Rogers testified that Clingon gave him a sealed evidence bag containing Petitioner's underwear, and he transported the bag to the crime laboratory for analysis. ([12-14] at 81.)

A forensic biologist at the Mississippi Crime Laboratory, Leslia Davis, testified that she received a sealed evidence bag containing Jamaya's underwear at the crime laboratory. ([12-15] at 124.)  Davis also testified that she received a sealed evidence bag containing Petitioner's underwear at the crime laboratory. ([12-15] at 128-29.)  According to Davis, if any of the evidence had not been properly sealed upon arrival at the crime lab, such would have been noted in the file. ([12-15] at 125.)  Davis testified that no such notation was made regarding the evidence in this case. ([12-15] at 125, 128-29.)[10]

Deputy Barnes testified that he retrieved Petitioner's underwear and Jamaya's underwear

---

[9] Blood was found on Jamaya's underwear, and a mixture of Petitioner's D.N.A. and Jamaya's D.N.A was found on Petitioner's underwear. ([12-14] at 127; [12-16] at 70-71.)

[10] During Davis's testimony, Jamaya's underwear was admitted into evidence without an objection from the defendant. ([12-15] at 126.)  Petitioner's underwear was admitted into evidence, over the defendant's objection. ([12-15] at 129.)

from the crime laboratory and that, to his knowledge, the evidence bags were sealed when he took possession of them. ([12-15] at 56-59.)  An investigator with the district attorney's office, Larry Moore, testified that Barnes gave him the evidence in this case. ([12-15] at 66.)  According to Moore, the bag containing Petitioner's underwear was sealed when he received it. ([12-15] at 68.)  Moore also testified that he did not alter, open, or destroy any evidence he received. ([12-15] at 72.)

An evidence custodian with the MBI, Darryl Perkins, testified that he received the evidence in this case from Moore and locked it in the MBI evidence vault, until he removed it and transported it to the trial court. ([12-15] at 77-78.)  Discussing the evidence bag containing Petitioner's underwear, Moore stated, "I do not recall it being opened.  I think it–probably during the transfer, it could have come open." ([12-15] at 79.)  According to Moore, he did nothing to alter or destroy the evidence in this case. ([12-15] at 82.)

The record demonstrates that the evidence at issue was collected by law enforcement officers, sealed in bags, taken to the crime laboratory, removed from sealed bags by the forensic scientists, and analyzed.  The record also demonstrates that law enforcement officers retrieved the evidence from the crime laboratory and transported it to the MBI evidence vault.  Although the evidence bags containing Petitioner's underwear and Jamaya's underwear were not fully sealed at the time of the trial, that fact alone is not enough to establish more that a mere suggestion that tampering or contamination of the evidence occurred. *See Hughes*, 90 So. 3d at 632; *see also*, *Nixon v. State*, 336 So. 2d 742, 743-44 (Miss. 1976) ("The presumption of regularity supports the acts of public officers in their custody" of the evidence.).

Petitioner has failed to establish an indication that the evidence had been tampered with,

and as such, he has failed to demonstrate a break in the chain of custody. Petitioner has failed to demonstrate that he would have been successful had his counsel properly asserted this issue in a motion notwithstanding the verdict and on direct appeal. Petitioner has failed to establish that the Mississippi Supreme Court unreasonably applied the *Strickland* requirements.

## RECOMMENDATION

For the reasons stated above, the undersigned recommends that the relief sought in Sims's Petition [1] be denied and that the Petition be dismissed with prejudice.

## NOTICE OF RIGHT TO OBJECT

In accordance with the rules and 28 U.S.C. § 636(b)(1), any party within fourteen days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the judge, the magistrate judge and the opposing party. The District Judge at the time may accept, reject or modify in whole or part, the recommendations of the Magistrate Judge, or may receive further evidence or recommit the matter to this Court with instructions. The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court to which the party has not objected. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428-29 (5th Cir. 1996).

This the 12th day of April, 2016.

s/ Michael T. Parker
United States Magistrate Judge

27